IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD J. DIETZ, | ) | CASE NO. 1:11CV1541 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Richard J. Dietz ("Plaintiff" or "Dietz") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act

(the "Act"), 42 U.S.C. §§ 416(i) and 423, and Supplemental Security Income ("SSI") under Title

XVI of the Act, 42 U.S.C. § 1381 *et seq.*  Doc. 1.  This matter has been referred to the

undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule

72.2(b)(1).  For the following reasons, the final decision of the Commissioner should be

**AFFIRMED.**

## I.  Procedural History

On May 11, 2007, Dietz filed his applications for SSI and DIB, alleging a disability onset

date of August 28, 2006.  Tr. 89-101.  Dietz claimed that he was disabled due to a combination

of impairments, including back problems, hearing loss, depression, and a pre-cancerous

esophagus.  Tr. 58.  The state agency denied Dietz's claims initially and upon reconsideration,

and Dietz timely requested a hearing before an administrative law judge.  Tr. 58-63, 67-80, 81-

82.  On November 23, 2009, a hearing was held before Administrative Law Judge Peter

Beekman (the "ALJ").  Tr. 25-53.  On December 8, 2009, the ALJ issued a decision finding that

1

Dietz was not disabled.  Tr. 8-24.  Dietz requested review of the ALJ's decision by the Appeals Council on January 5, 2010.  Tr. 6-7.  On June 10, 2011, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.    Background

Dietz was born on May 11, 1957.  Tr. 18.  At the time of the administrative hearing, he was 52 years old.  Tr. 89.   Dietz attended high school into the eleventh grade, but did not graduate.  Tr. 28.  At the time of the hearing, Dietz was divorced and lived alone.  Tr. 32, 125.  He previously worked as a pipe fitter.  Tr. 32.

### B.    Medical Evidence

Dietz injured his back in a fall while at work on August 28, 2006.  Tr. 164.  He reported to the emergency department at the Ashtabula County Medical Center for his injury.  Tr. 163-170.  On examination, his gait was slow and steady.  Tr. 164.  X-rays of the lumbar spine revealed mild scoliosis and degenerative disc disease of the lumbar spine without acute compression or spondylolisthesis.  Tr. 169.

On October 11, 2006, Abdul Itani, M.D., examined Dietz for complaints of low back pain.  Tr. 182.  Dr. Itani found that Dietz had "slightly limited" back movements, no gross motor deficit in any of his muscle groups, and no atrophy.  Tr. 182.  He had normal straight leg raising tests, symmetrical reflexes, and normal sensory responses.  Tr. 182.  A magnetic resonance imaging (MRI) scan showed degenerative disc disease throughout the lumbar spine, with a herniated lumbosacral disc.  Tr. 182.  At an office visit on March 21, 2007, Dr. Itani recommended epidural steroid injections for pain relief and increased function.  Tr. 183.

M.P. Patel, M.D., treated Dietz for his back pain since his injury in 2006.  Tr. 184-207, 245-408.  In an office visit on September 11, 2006, Dr. Patel noted some spasm, tenderness, restricted ranges of motion, and mildly abnormal straight leg raises.  Tr. 293.  He also observed pain and gait abnormalities in the lower extremities.  Tr. 292.  Dr. Patel noted that Dietz's treatment included a variety of pain medications, as well as a home exercise program of stretching, mobilizing, and strengthening exercises.  Tr. 263-75, 383.  In a letter to the Trustees of the Local Pipe Fitter Union dated June 11, 2007, Dr. Patel stated that Dietz would not be able to engage in any gainful employment until July 23, 2007.  Tr. 319.  In a treatment note dated August 13, 2007, Dr. Patel described Dietz's condition as "fairly stable, except for occasional exacerbations requiring activity restriction and increase in medication.  Exacerbation short in duration, not lasting more than a few hours.  No significant difficulty walking or standing."  Tr. 367.  Dr. Patel completed a form for the Ohio Bureau of Worker's Compensation on December 20, 2007, and revised the return to work date for Dietz to January 20, 2008.  Tr. 394.

On April 18, 2008, John Collis, M.D., examined Dietz and evaluated his back and leg conditions.  Tr. 455-60.  A nerve conduction electromyogram revealed evidence of lumbar radiculopathy at L5 and L4.  Tr. 458-59.  On May 22, 2008, Dr. Collis re-examined Dietz and stated that the nerve conduction time was normal and that some irritation at the fourth and fifth lumbar nerves was consistent with compression at the root level.  Tr. 427.  Dr. Collis reviewed the MRI scan and concluded that Dietz's condition warranted back surgery for decompression of the lumbar discs, which he believed would greatly alleviate Dietz's leg pain.  Tr. 427-28.  Dr. Collis performed the surgery on Dietz's back on June 16, 2008.  Tr. 429-33.  Dietz presented to Dr. Collis for a follow up visit on August 13, 2008.  Tr. 456.  Dr. Collis noted that Dietz was having much less pain since his back surgery.  Tr. 456.  He found that Dietz's neurological

condition was stable and recommended that Dietz increase his activities to a light level, with a lifting limit of twenty to thirty pounds.  Tr. 456.  Dr. Collis also arranged for physical therapy. Tr. 456.  At a follow up visit on November 19, 2008, Dr. Collis found that Dietz's old back pain had been relieved, but that Dietz complained of different, new pain following physical therapy. Tr. 455.

On November 19, 2009, Dr. Patel completed a medical source statement regarding Dietz's physical impairments.  Tr. 551.  Dr. Patel opined that Dietz could lift twenty pounds occasionally and five pounds frequently, sit for four hours a day, stand and walk for three hours a day, and rarely/never climb, balance, stoop, crouch, kneel, or crawl.  Tr. 551.

**2.      State Agency Psychologist/Physicians**

On June 26, 2007, Richard Halas, M.A., a clinical psychologist, examined Dietz and evaluated his mental condition.  Tr. 210-17.  He noted that Dietz was appropriate and cooperative throughout the interview (Tr. 210) and his mental content examination was within normal limits.  Tr. 211.  Mr. Halas diagnosed Dietz with a depressive disorder and polysubstance abuse in early remission, and assessed a Global Assessment of Functioning (GAF) score of 45.[1] Tr. 214.  Mr. Halas concluded that Dietz had a marked restriction in relating to others; an intact ability to perform simple one and two step tasks; an intact ability to maintain attention to do simple repetitive tasks; and a marked limitation of his ability to withstand stress associated with work.  Tr. 214.

---

[1] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

On July 17, 2007, Bruce Goldsmith, Ph.D., a state agency psychologist, reviewed Dietz's medical records for consideration of Listings 12.04 (affective disorders) and 12.09 (substance addiction disorders).  Tr. 219-32.  Dr. Goldsmith opined that Dietz had a depressive disorder, but that his impairment did not meet or equal the criteria of any Listing.  Tr. 219.  He also found that Dietz had mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace, and no episodes of decompensation.  Tr. 229.  Dr. Goldsmith reviewed Mr. Halas's assessment and explained that he gave little weight to his opinion Dietz had marked limitations in relating to others and withstanding stress, citing contradictory examination findings from the examining psychologist. Tr. 235.  Dr. Goldsmith concluded that Dietz was capable of performing jobs without strict production quotas; consisting of only one or two-step tasks; and that involved minimal public interaction.  Tr. 235.

On July 25, 2007, Jon Starr, M.D., a state agency physician, reviewed Dietz's medical records and assessed his physical functioning.  Tr. 237-44.  Dr. Starr indicated that Dietz retained the capacity for medium work (Tr. 238) that involved frequent climbing of ramps and stairs; occasionally climbing of ladders, ropes, and scaffolds; and frequently stooping and crouching. Tr. 239.  He also noted that, although Dietz alleged a hearing loss, he did not wear any hearing aids and could hear adequately over the telephone.  Tr. 241.

## C.    Evidence Submitted to the Appeals Council

In October 2010, Plaintiff submitted additional medical evidence to the Appeals Council after the ALJ's decision.  Tr. 552-96.  Most of this evidence pertains to treatment he received after the ALJ's decision on December 8, 2009.  Tr. 553-60, 565-84, 588-93, 595.  The few records that related to his condition prior to December 8, 2009 revealed that, in November 2009,

Dietz continued treatment for back problems and received epidural steroid injections for pain relief.  Tr. 561-63, 585-86.

**D.      Administrative Hearing**

**1.      Dietz's Testimony**

On November 23, 2009, Dietz appeared with counsel and testified at a hearing before the ALJ.  Tr. 62-78.  He stated that he had worked as a pipe fitter.  Tr. 28.  He described that, on August 28, 2006, he was involved in an accident at work where he tripped and fell and injured his back.  Tr. 28.  He testified that he was receiving worker's compensation benefits for his injury.  Tr. 29.  Dietz stated that he had surgery on his back and it was successful in alleviating some of the pain and numbness in his legs.  Tr. 29.  He also testified that he was in pain management to treat his back pain.  Tr. 29-30.

Dietz testified about his daily activities.  He stated that he lived alone in a two story house and generally kept his house clean.  Tr. 32.  He reported that he made his bed and cared for his personal hygiene.  Tr. 32-33.  He also stated that he socialized with friends, saw his grandchildren, and regularly attended Alcoholics Anonymous meetings.  Tr. 32-33.  Dietz further stated that he prepared meals for himself and also watched television.  Tr. 32-35.  He testified that he drove to Hilton Head, South Carolina, for a family vacation.  Tr. 38.  In addition, in a report to the state agency, Dietz stated that he was able to live independently, care for himself, prepare meals, attend Alcoholics Anonymous meetings, wash laundry, perform basic household chores, drive, shop, manage a savings account, and use a checkbook.  Tr. 126-29.

**2.      Vocational Expert's Testimony**

Carol Mosely appeared at the hearing and testified as a vocational expert (the "VE").  Tr. 46-52.  She stated that Dietz had previously worked as a pipe fitter, which was heavy or very

heavy work and a skilled position, but the skills were very specific to that type of work and could not be transferred.  Tr. 46-47.  The ALJ then asked the VE whether a hypothetical individual with Dietz's vocational characteristics and the following limitations could perform any work in the national economy:

> [L]ift 20 pounds occasionally, 10 pounds frequently, can stand/walk six out of eight.  No limit on push/pull or foot pedal, occasionally use a ramp or stairs, never use a ladder, rope or scaffold, frequently balance, occasionally stoop, kneel or crouch, crawl.  No manipulative or communications deficits.  No visual deficits.  This person should avoid wetness and humidity, unprotected heights.  This person should do no complex tasks, but can do simple, routine tasks.  He should do low stress work.  No high production quotas, no piece rate work.  No work involving arbitration, negotiation or confrontation.

Tr. 47-48.  The VE testified that Dietz could perform work at the unskilled, light level that existed in significant numbers in the national economy, including the following jobs: packer (3,500 jobs in Ohio and 500,000 jobs nationally); cleaner (3,000 jobs in Ohio and 550,000 jobs nationally); and kitchen worker (3,000 jobs in Ohio and 500,000 jobs nationally).  Tr. 48.  In a second hypothetical, the ALJ added restrictions that the hypothetical individual would need to take a break every 50 to 55 minutes from standing and either walk around or sit and, if the person were walking around, then he would need to take a break and sit every 50 to 55 minutes.  Tr. 49-50.  The VE responded that the individual would not be able to perform the jobs she previously identified with the addition of the standing/sitting restrictions because they would essentially limit the individual to sedentary work.  Tr. 50.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).   In making a determination as to disability under this definition, an ALJ

is required to follow a five-step sequential analysis set out in agency regulations.  The five steps

can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.   If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L.

Ed. 2d 119, 107 S. Ct. 2287 (1987).   Under this analysis, the claimant has the burden of proof at

Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

residual functional capacity ("RFC") and vocational factors to perform work available in the

national economy.  *Id.*

## IV.  The ALJ's Decision

At Step One of the sequential analysis, the ALJ found that Dietz had not engaged in substantial gainful activity since August 28, 2006, the alleged onset date.  Tr. 13.  At Step Two, the ALJ determined that Dietz had the following severe impairments: discogenic and degenerative disorders of the back and an affective disorder.  Tr. 13.  At Step Three, the ALJ found that Dietz did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.[2]  Tr. 14. The ALJ then determined Dietz's RFC and found that he could perform a range of light work:

> [H] can lift, carry, push and pull 20 pounds occasionally and ten pounds frequently.  He can sit for six hours and stand and/or walk for six hours in a normal workday.  He cannot climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs.  He can frequently balance and can occasionally stoop, kneel, crouch, and crawl.  He must avoid exposure to wetness, humidity, and hazardous heights.  He is limited to simple, routine tasks and cannot perform complex tasks.  He is limited to low-stress work that does not involve production quotas or piece rate work.  He cannot perform work involving arbitration, confrontation, or negotiation.  He is capable of understanding, remembering, and carrying out simple instructions; responding appropriately to supervision, coworkers, and usual work situations; dealing with changes in a routine work setting; and making judgments that are commensurate with the functions of unskilled work.

Tr. 15.  At Step Four, the ALJ found that Dietz could not perform his past relevant work.  Tr. 18. Finally, at Step Five, after considering his vocational factors, RFC, and the evidence from the VE, the ALJ found that Dietz was capable of performing work that existed in significant numbers in the national economy. Tr. 19.  Thus, the ALJ concluded that Dietz was not disabled. Tr. 19-20.

---

[2]  The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

## V. Arguments of the Parties

Dietz objects to the ALJ's decision on two grounds. First, he asserts that the ALJ erred in finding that his impairments did not meet or equal a Listed Impairment. Second, Dietz argues that the ALJ erred in finding that he retained the RFC to perform a restricted range of light work.

In response, the Commissioner argues that substantial evidence supports the ALJ's determination that Dietz's impairments did not meet or equal a Listed Impairment. The Commissioner also asserts that substantial evidence supports the ALJ's RFC determination.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

A.    **Evidence Submitted to Appeals Council**

After the ALJ issued his decision, Dietz submitted new evidence to the Appeals Council, which thereafter denied review.  Tr. 1-5, 552-96.   Dietz's arguments in the current appeal are based, in part, on the new evidence.  Doc. 8, pp. 10-14.  This is improper.  The Sixth Circuit has repeatedly held that where, as here, the Appeals Council denies review and the ALJ's decision becomes the Commissioner's decision, the court's review is limited to the evidence presented to the ALJ.  *See Jones v. Commissioner*, 336 F.3d 469, 478 (6th Cir. 2003); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Commissioner*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *see also Osburn v. Apfel*, No. 98–1784, 1999 WL 503528, at * 4 (6th Cir. July 9, 1999) ("Since we may only review the evidence that was available to the ALJ to determine whether substantial evidence supported [his] decision, we cannot consider evidence newly submitted on appeal after a hearing before the ALJ.").  The court may not consider a plaintiff's proposed additions to the record in determining whether the Commissioner's decision is supported by substantial evidence.  *See Cline,* 96 F.3d at 148.  Evidence first submitted to the Appeals Council may be considered only to determine whether the case should be remanded under sentence six of 42 U.S.C. § 405(g).  *Id.*  The statute permits only two types of remand: a sentence four (post-judgment) remand made in connection with a judgment affirming, modifying, or reversing the Commissioner's decision; and a sentence six (pre-judgment) remand where the court makes no substantive ruling as to the correctness of the Commissioner's decision.  *See, e.g., Hollon v. Commissioner*, 447 F.3d 477, 486 (6th Cir. 2006).  The court cannot consider evidence that was not submitted to the ALJ in the sentence four context; it only

can consider such evidence in determining whether a sentence six remand is appropriate.  *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster*, 279 F.3d at 357.

The plaintiff has the burden under sentence six of 42 U.S.C. § 405(g) of demonstrating that the evidence he now presents in support of a remand is "new" and "material," and that there is "good cause" for the failure to present this evidence in the prior proceeding.  *See Hollon*, 447 F.3d at 483; *see also Ferguson v. Commissioner*, 628 F.3d 269, 276 (6th Cir. 2010).  Further, to be material, the new evidence must relate to the plaintiff's condition on or before the ALJ's decision.  *Casey,* 987 F.2d at 1233 ("The rest of the material contained in the additional evidence pertains to a time outside the scope of our inquiry.").

Dietz has not addressed, much less carried, his burden in this case.  He has failed to explain why the evidence he submitted to the Appeals Council was not obtained earlier and submitted to the ALJ before the ALJ's decision.  It appears, however, that most of this evidence relates to treatment Dietz received after the ALJ's decision.  In any event, Dietz has also failed to establish that this evidence is material, i.e., that it relates back to his condition before the ALJ's decision.  It should also be noted Dietz has not requested a sentence six remand.  Therefore, the Court will not consider any evidence that was not in the record when the ALJ issued his decision.

**B.**  **Substantial Evidence Supports the ALJ's Determination that Dietz did not Meet or Equal a Listed Impairment**

Dietz asserts that the ALJ erred under Step Three in finding that his mental impairments did not meet or equal Listing 12.04.  Doc. 8, p. 7.  Specifically, he argues that the ALJ erred in analyzing the paragraph B criteria of Listing 12.04.  For a claimant to show that his impairment equals an impairment in the Listings, he must meet all of the specified medical criteria; an impairment that manifests only some of those criteria, no matter how severely, does not qualify.  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  In this case,

substantial evidence supports the ALJ's conclusion that Dietz does not have an impairment or combination of impairments that meets or medically equals Listing 12.04.

Listing 12.04 describes affective disorders and provides, in relevant part:

Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.  Medically documented persistence, either continuous or intermittent, of one of the following:

    1.  Depressive syndrome characterized by at least four of the following:

        a.  Anhedonia or pervasive loss of interest in almost all activities; or
        b.  Appetite disturbance with change in weight; or
        c.  Sleep disturbance; or
        d.  Psychomotor agitation or retardation; or
        e.  Decreased energy; or
        f.  Feelings of guilt or worthlessness; or
        g.  Difficulty concentrating or thinking; or
        h.  Thoughts of suicide; or
        i.  Hallucinations, delusions, or paranoid thinking . . .

\* \* \*

B.  Resulting in at least two of the following:

    1.  Marked restriction of activities of daily living; or
    2.  Marked difficulties in maintaining social functioning; or
    3.  Marked difficulties in maintaining concentration, persistence, or pace; or
    4.  Repeated episodes of decompensation, each of extended duration[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.04.  The ALJ determined that Dietz's mental impairment did not meet or medically equal the criteria under paragraph B.  Tr. 14.  The ALJ found that Dietz had only mild restriction in activities of daily living; mild difficulties in social functioning as evidenced by the fact that he socialized with friends and family and attended AA meetings; moderate difficulties with regard to maintaining concentration, persistence or pace;

and had experienced no episodes of decompensation.  Tr. 14.  The ALJ also correctly noted that

no treating or examining physician had found that Dietz met or equaled any Listing.  Tr. 13.

There appears to be no dispute that Dietz met the requirements of Part A of Listing 12.04

and the Commissioner does not dispute that Part A is satisfied for Listing 12.04.  The parties

dispute whether paragraph B of the Listing is satisfied.[3]  Dietz asserts that he satisfied all of the

paragraph B criteria based on the assessment of the Mr. Halas, the state agency examining

psychologist who found marked limitations in Dietz's mental functioning.  Doc. 8, p. 9.  Dietz

argues that the ALJ erred by discounting the opinion Mr. Halas.  In support, he cites to the

treating physician rule and suggests that Mr. Halas's opinion was entitled to deference.[4]  These

arguments are unpersuasive.

First, Mr. Halas's opinion was not entitled to substantial deference because he was not a

treating physician.  *See, e.g., Barker v. Shalala,* 40 F.3d 789, 794 (6th Cir. 1994).  The treating

physician doctrine is based on the assumption that a medical professional who has dealt with a

claimant and his maladies over a long period of time will have a deeper insight into the medical

condition of the claimant than will a person who has examined a claimant but once, or who has

only seen the claimant's medical records.  *Id.*  Mr. Halas only examined Dietz on one occasion

and did not administer any treatment to Dietz.  Thus, the rationale of the treating physician

doctrine does not apply here.  *Id.*

---

[3] The claimant's level of functional limitation is rated in four functional areas, commonly known as the "B criteria":
(1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of
decompensation.  20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00 *et seq.*; *Craft v. Astrue*, 539 F.3d 668, 674 (7th
Cir.2008)).  The degree of limitation in the first three functional areas is rated using the following five-point scale:
none, mild, moderate, marked, and extreme.  20 C.F.R. § 404.1520a(c)(4).  The degree of limitation in the fourth
functional area (episodes of decompensation) is rated using a four-point scale: none, one or two, three, four or more.
*Id.*  The "B criteria" of Listing 12.04 require "marked" limitations of functioning or "repeated" episodes of
decompensation, each of extended duration.

[4] Under the treating physician rule, the opinion of a treating source is entitled to controlling weight if the opinion is
(1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent
with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir.
2004); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Second, in reaching his conclusion under Step Three, the ALJ relied on the opinion of Dr. Goldsmith, a state agency psychologist who reviewed Dietz's medical records for consideration under Listing 12.04 and assigned little weight to the findings of Mr. Halas with regard to the degree of limitation caused by Dietz's mental impairment.  Tr. 14.  Dr. Goldsmith explained that Mr. Halas's findings of marked limitations in the areas of relating to others and dealing with stress were not supported by Halas's own examination findings.  Tr. 235.  Dr. Goldsmith also stated that Mr. Halas did not provide objective findings or specific observations to support his conclusions.  He also noted that Dietz's own statements regarding his activity level evidenced that he had a fairly active social life, including attending AA meetings and church services, and was able to do a wide variety of household and personal care tasks.  Tr. 235.  Dr. Goldsmith concluded that Dietz did not suffer from marked limitations in functioning due to his mental impairment.  Tr. 235.  The ALJ expressly relied upon Dr. Goldsmith's opinion in his Step Three Analysis, which in turn provides a reasonable basis for rejecting the opinion of the Mr. Halas. Tr. 14.

Moreover, upon review of the record, substantial evidence supports the ALJ's conclusions with regard to the specific paragraph B criteria.  The ALJ found that Dietz had mild restriction in activities of daily living.  Tr. 14.  The regulations provide guidance on how activities of daily living are assessed in the context of a mental impairment:

> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

20 C.F.R. 404, Subpt. P., App. 1, § 12.00C(1).  Here, there is substantial evidence in the record to support the ALJ's conclusion that Dietz had only mild restriction in his activities of daily living due to his mental condition.  For example, Dietz testified that he lived alone and was able to care for himself.  Tr. 32-33.  He was able to cook, clean his house, wash laundry, drive, shop, and handle his own finances (he had a savings account and used a checkbook).  Tr. 32-38, 126-29.  In addition, Dietz's medical records reflect no restrictions in this area.  Thus, substantial evidence supports the ALJ's conclusion regarding Dietz's activities of daily living.

In the area of social functioning, the ALJ found that Dietz had mild difficulties.  Tr. 14.  The regulations also describe how difficulties in social functioning due to mental impairments are assessed:

> Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others. . . . You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. . . . We do not define 'marked' by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with functioning.

20 C.F.R. 404, Subpt. P., App. 1, § 12.00C(2).  Substantial evidence supports the ALJ's finding of only mild difficulties in this area.  Dietz testified that he socialized with friends, visited his grandchildren, and regularly attended Alcoholics Anonymous meetings.  Tr. 32-33.  He also attended church.  Tr. 213.  Furthermore, at the hearing, Dietz did not testify that he had any impairments in social functioning.  Likewise, there is no evidence in the relevant medical history that Dietz had impairments in social functioning, i.e., history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation.[5]  The ALJ's

---

[5] There is some indication that Dietz may have had difficulties in social functioning in the evidence that he submitted to the Appeals Council after the ALJ issued his decision.  Tr. 588-93.  However, for the reasons set forth above, the Court's review is limited to the evidence that was before the ALJ when he issued his decision.

conclusion in this area is therefore substantially supported.

With regard to maintaining concentration, persistence or pace, the ALJ found that Dietz had moderate difficulties in this area.  Tr. 14.  The regulations provide that difficulties in concentration, persistence or pace due to mental impairments are assessed as follows:

> Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. . . . Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion.  However, if you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

20 C.F.R. 404, Subpt. P, App. 1, § 12.00C(3).  Again, substantial evidence supports the ALJ's finding that Dietz had moderate difficulties in this area.  The ALJ noted that Dietz drove to Hilton Head for vacation. The ability to drive for a long distance evidences that Dietz had some ability to maintain his concentration, persistence, and pace.  Moreover, Dr. Goldsmith found that Dietz only had moderate difficulties in maintaining concentration, persistence or pace.  Tr. 229. In particular, Dr. Goldsmith found that Dietz was not limited in the ability to carry out very short and simple instructions, the ability to sustain an ordinary routine without special supervision, and the ability to make simple work-related decisions.  Tr. 233.  He also found only moderate limitations in the remaining areas under this category, including the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, the ability to work in coordination with or proximity to others without being distracted by them, and the ability to complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 233-34.  Further, at the hearing, Dietz did not testify that he suffered from any difficulties with concentration, persistence or pace. Thus, substantial evidence supports the ALJ's conclusion that Dietz had no more than moderate difficulties in maintaining concentration, persistence or pace.

Finally, Dietz does not dispute the ALJ's finding of no episodes of decompensation; a review of the record confirms this finding.  Tr. 266.  In sum, the ALJ's conclusion as to each of the paragraph B criteria is supported by substantial evidence and his conclusion that Dietz did not meet or equal Listing 12.04 should be affirmed.

## C.    Substantial Evidence Supports the ALJ's RFC Determination

Dietz argues that the ALJ's erred in determining that he could perform a range of light work because the ALJ failed to give deference to the opinion of his treating physician, Dr. Patel. Doc. 8, pp. 10-15.  Specifically, Dietz contends that the ALJ failed to articulate a valid basis for not giving controlling weight to the opinion of Dr. Patel.  Doc. 8, pp. 11-12.  Contrary to this argument, the ALJ properly evaluated the opinion of Dr. Patel under the treating physician rule.

Under the treating physician rule, the opinion of a treating source is entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If the opinion of a treating source is not accorded controlling weight, an ALJ must consider certain factors in determining what weight to give the opinion, such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the

consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(d), 416.927(d).

If an ALJ assigns less than controlling weight to a treating source's opinion, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544.  However, the ALJ is not obliged to explain the weight afforded to each and every factor that might pertain to the medical source opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. App'x. 802, 804 (6th Cir. 2011); *Allen v. Commissioner of Social Security*, 561 F.3d 646, 651 (6th Cir. 2009) (even a "brief" ALJ statement identifying such factors will be found adequate to articulate "good reasons" to discount a treating physician's opinion).

In his November 2009 assessment, Dr. Patel opined that Dietz could lift twenty pounds occasionally and five pounds frequently, sit for four hours a day, stand and walk for three hours a day, and rarely/never climb, balance, stoop, crouch, kneel, or crawl.  Tr. 551.  The ALJ considered Dr. Patel's findings and reasonably decided to give them less than controlling weight. Tr. 17.  The ALJ explained that he did not give full weight to Dr. Patel's findings because they were not supported by the relatively benign objective evidence and because of Dietz's wide range of daily activities.  Tr. 17.  For example, the ALJ noted that Dietz drove to Hilton Head for vacation, which he found to contradict the limitation on sitting set forth by Dr. Patel.  Tr. 17. The ALJ also noted that Dietz had the ability to shop and wash his car, which he found to contradict the severe limitations on standing and walking set forth by Dr. Patel.  Tr. 17.  The ALJ's explanation demonstrates that he properly considered the controlling regulatory factors and discounted Dr. Patel's opinion based on the supportability of his opinion and the consistency

of his opinion with the evidence of record.  The ALJ therefore stated good reasons for assigning

less than controlling weight to Dr. Patel's opinion and fulfilled his obligations under the

regulations.  *See, e.g., Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (finding

that an ALJ provided good reasons for discounting treating physician opinion where the ALJ's

stated reason was brief but reached several of the factors an ALJ must consider when

determining what weight to give non-controlling opinion); *Bledsoe v. Barnhart*, 2006 WL

229795, at *4 (6th Cir. 2006) ("The ALJ reasoned that Dr. Lin's conclusions are 'not well

supported by the overall evidence of record and are inconsistent with other medical evidence of

record.' This is a specific reason for not affording controlling weight to Dr. Lin.").

      A review of the record reveals that the reasons provided by the ALJ for discounting Dr.

Patel's opinion are supported by substantial evidence.  First, Dietz participated in a variety of

activities of daily living that are inapposite to the severe restrictions found by Dr. Patel.  For

instance, Dietz lived alone and generally cared for himself and his home.  Tr. 32-33.  He

socialized with friends, visited with his grandchildren, and regularly attended Alcoholics

Anonymous meetings.  Tr. 32-33.  He also prepared his own meals, watched television, drove,

shopped for groceries, did his own laundry.  Tr. 32-35.  Second, there is evidence in the record

that Dietz's condition improved after his accident.  On August 13, 2007, Dr. Patel described

Dietz's condition as "fairly stable, except for occasional exacerbations requiring activity

restriction and increase in medication.  Exacerbation short in duration, not lasting more than a

few hours.  No significant difficulty walking or standing."  Tr. 367.  In addition, on August 13,

2008, Dr. Collis noted that Dietz was having much less pain since his back surgery.  Tr. 456.  He

also recommended that Dietz increase his activities to a light level, with a lifting limit of twenty

to thirty pounds.  Tr. 456.  And, on November 19, 2008, Dr. Collis noted that Dietz's old back

pain had been relieved.  Tr. 455.  This evidence supports the ALJ's determination to give less than controlling weight to Dr. Patel's findings, as well as the ALJ's conclusion that Dietz could perform light work subject to certain limitations.

Dietz argues that the ALJ improperly assumed the role of a medical expert when he determined that Dietz could perform a range of light work.  Doc. 8, pp. 13-15.  This argument is without merit.  The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician.  *See* 20 C.F.R. §§ 404.1546(c), 416.946(c).  "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."  *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009).  Here, the ALJ weighed the medical and non-medical evidence and reasonably concluded that Dietz could perform light work.  The ALJ's rejection of Dr. Patel's opinion was permissible and supported by substantial evidence, and he did not improperly assume the role of a medical expert when he concluded that Dietz retained the RFC to perform light work subject to certain limitations.

Finally, Dietz accuses the ALJ of essentially cherry picking the record and ignoring evidence that supported his claim.  Doc. 8, pp. 13-14.  As noted by the Sixth Circuit, the so-called cherry picking of evidence by the ALJ "can be described more neutrally as weighing the evidence."  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citation omitted).  "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  *Id.* at 773 (citations omitted).  Here, the ALJ reviewed the entire record, weighed the evidence, and concluded that Dietz

21

retained the ability to do light work subject to certain limitations.  This decision is supported by substantial evidence.  Accordingly, the decision of the ALJ should not be disturbed, even though there may be some evidence in the record that could support a different conclusion.

### VII.  Conclusion and Recommendation

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff Richard J. Dietz's applications for DIB and SSI should be **AFFIRMED**.

Dated: August 1, 2012

_____
Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).